UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES E. PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-01876-JPH-KMB |
| | ) | |
| REAGAL, | ) | |
| BOLDMAN, | ) | |
| PLEEFER, | ) | |
| D. DAVIS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT, AND DIRECTING FURTHER PROCEEDINGS**

James Phillips claims that he was subjected to excessive heat in a
disciplinary segregation unit at Pendleton Correctional Facility in violation of the
Eighth Amendment. He is suing Warden Dennis Reagle, Captain James
Boldman, Lieutenant Michael Pfleeger, and Officer Dennis Davis for damages
and injunctive relief. All parties have moved for summary judgment. As
explained below, the defendants' motion for summary judgment is **GRANTED in
part and DENIED in part,** and the plaintiff's motion for summary judgment is
**DENIED**.

## I. Summary Judgment Standard

Parties in a civil dispute may move for summary judgment, which is a way
of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment
is appropriate when there is no genuine dispute as to any of the material facts,
and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v.*

*Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. Factual Background

### A. The Parties and G Cell House

At all times relevant to the allegations in the Complaint, Mr. Phillips was an inmate at Pendleton Correctional Facility, dkt. 41 at 2; dkt. 62 at 1, and Defendants were employees of the Indiana Department of Corrections working at Pendleton, dkt. 41 at 3, dkt. 62 at 2. Defendants Boldman and Pfleeger were correctional officers assigned to G Cell House, defendant Davis was a correctional officer assigned to the property room, and defendant Reagle was the Warden. Dkt. 41 at 3.

G Cell House is a disciplinary segregation unit at Pendleton Correctional Facility. Dkt. 42-2 at ¶ 4. Inmates in G Cell House spend a minimum of twenty-three hours a day in their cells. Dkt. 42-1 at 57. Mr. Phillips has been placed in G Cell House many times. Dkt. 42-1 at 59. He was most recently placed in G Cell House when he was found in possession of a weapon. *Id.* at 16.

There are three tiers (or "ranges") of cells in G Cell House. *Id.* at 29. During the time relevant to this lawsuit, Mr. Phillips' cell was on the top range. *Id.* at 49-50.

### B. Policy prohibiting fans in G Cell House

G Cell House does not have air conditioning. Dkt. 42-1 at 29; dkt. 42-2 at ¶ 8. The offices where Captain Boldman and Lt. Pfleeger worked were air conditioned. Dkt. 42-1 at 28. Historically, inmates in G Cell House were allowed to keep personal fans in their cells to stay cool. *Id.* at 19.

In March 2021, Warden Reagle instituted a policy that prohibited inmates in G Cell House from keeping personal fans in their cells. Dkt. 42-2 at ¶ 6; *see also id.* at 4-5 ("Pendleton Correctional Facility G Cell House Property List 3-8-2021 Final"). Pursuant to this policy, Officer Davis confiscated Mr. Phillips' personal fans in March 2021. Dkt. 42-1 at 21, 27.

A common reason for an inmate to be placed in G Cell House is for possessing a dangerous weapon or prohibited contraband. Dkt. 42-2 at ¶ 5. Captain Boldman and Lieutenant Pfleeger have seen personal fans be modified, manipulated, or broken down by inmates to be used as weapons against other inmates and correctional staff. *Id.* at ¶ 7; dkt. 42-4 at ¶ 7. Mr. Phillips has been incarcerated for more than twenty years and does not recall seeing an inmate use a personal fan as a weapon. Dkt. 42-1 at 12, 23.

### C. Attempts to keep G Cell House cool in the summer

#### 1. Blower system and fans

To address the issue of heat in the summer months, a "blower" ventilation system circulates air in G Cell House. Dkt. 42-2 at ¶ 9. Each inmate in G Cell House has an individual vent in his cell. *Id.* There are also thirty-six mounted wall fans within G Cell House. *Id.* at ¶ 10.

According to Mr. Phillips, the blower system did not cool the air; it merely circulated hot air and made the temperature in his cell feel hotter. Dkt. 64 at ¶ 25.

4

### 2. Windows

G Cell House has windows on the wall facing the inmates' cells. Dkt. 42-1 at 29. Captain Boldman and Lieutenant Pfleeger "recall all of the operable windows being opened on the ranges of G Cell House during June of 2021." Dkt. 42-2 at ¶ 13; dkt. 42-4 at ¶ 13.

According to Mr. Phillips, however, during Summer 2021, "none of the windows were open, not that I could see, not to my knowledge anyway." Dkt. 42-1 at 19. Mr. Phillips testified that he asked Captain Boldman, Lieutenant Pfleeger, and Officer Davis to open the windows, but that Captain Boldman and Lieutenant Pfleeger stated "at first they couldn't find the tool to open them up, and it was so many different excuses. Then they couldn't find the tool, then they didn't want to do it, and then it's we're going to open them up, and they never got opened." *Id.* at 31. When Mr. Phillips asked Officer Davis about opening the windows, in March 2021 when his fans were confiscated, Officer Davis said that the decision to open the windows was "above [his] pay grade." *Id.* at 31-32.

### 3. Ice

Prison officials regularly check the temperature of G Cell House with a hand-held thermostat. Dkt. 42 at ¶ 11. On "normal" days, each inmate receives one scoop of ice. *Id.* On days when the temperature exceeds eighty-five degrees, each inmate receives two scoops of ice. *Id.*

### D. Temperature in G Cell House

No temperature readings from G Cell House have been entered into evidence. Captain Boldman and Lieutenant Pfleeger both "do not recall any

specific day in June of 2021 on G Cell House as being so warm as to [make] the conditions unreasonably hot or excessively so." Dkt. 42-2 at ¶ 12; dkt. 42-4 at ¶12.

Mr. Phillips testified that the temperature in G Cell House in Summer 2021 "was way too hot. You barely can breathe, stifling heat. I was actually scared to go to sleep because I thought I would die in my sleep. And I spent most of my time just trying to . . . keep cool, and keep myself hydrated." Dkt. 42-1 at 46. Further, he testified that the temperature was significantly hotter on the upper range, where his cell was located, than on the bottom ranges. *Id.* at 49-50 ("[I]t's hotter the higher that you go because heat rises to the top. Like when they used to bring me down or when—whenever I was downstairs, you could feel a big temperature difference from being up here and being down there.").[1]

Mr. Phillips had access to running water in his cell and was able to drink water to avoid dehydration. Dkt. 42-1 at 46.

**E. Mr. Phillips collapsed twice from excessive heat**

Mr. Phillips collapsed twice in G Cell House after becoming overheated. Dkt. 42-1 at 32-33. His first collapse was on June 12, 2021, and the second was

---

[1] In their memorandum in support of summary judgment, the defendants state that Mr. Phillips "also complained about the windows being left open because it was too cold at times." Dkt. 41 at 5, ¶ 31 (citing dkt. 42-1 at 41). But the "[o]nly time [Mr. Phillips] complained about when it's too cold is when [prison officials] don't turn the heat on in the wintertime" and leave the windows open. Dkt. 41-1 at 42. Mr. Phillips has been consistent in his allegations that G Cell House was excessively hot and the windows were not open in Summer 2021.

on June 14, 2021. Dkt. 60-1 at 4.[2] After each collapse, he was carried to the bottom range, put in a wheelchair, and taken to the infirmary. Dkt. 42-1 at 32-33. The medical staff lowered Mr. Phillips' body temperature by placing ice packs in his armpits and on his head and letting him drink cold water. *Id.*

On June 15, 2021, Mr. Phillips submitted a Request for Health Care form, stating

> I had a heat stroke on Saturday 6-12-21 and then I had another on Monday 6-14-21 due to extremely hot temps in G Cell House where there's no air conditioning and we are not allowed to have our personal fans and I'm housed on top range (6D) where it's twenty degrees hotter and now I'm having constant dizziness, blurred vision, low energy, and no appetite and chest pains as well.

Dkt. 60-1 at 4. This Request for Health Care form was signed by J. Murphy, and Mr. Phillips was "referred to M.D. x 3." *Id.*

In addition to these two infirmary visits and the symptoms described in his Request for Health Care form, Mr. Phillips testified that he also suffered insomnia and night terrors as a result of the high temperatures in his cell. Dkt. 42-1 at 46-47. He had not previously suffered from insomnia or night terrors, and these symptoms subsided after he left G Cell House and returned to a general population unit. *Id.* The heat made him sweat constantly, which subjected him to foul odors. *Id.* at 48-49.

---

[2] It appears from the National Weather Service that the temperature was 93 degrees at the nearby Anderson Sewage Plant in Anderson, Indiana, on June 12, 2021. National Weather Service, National Oceanic and Atmospheric Administration (available at https://www.weather.gov/wrh/Climate?wfo=ind) (last visited August 23, 2023).

**F. Officer Davis**

Officer Davis is the Property Room Supervisor at Pendleton. Dkt. 42-3 at ¶ 3. He oversees the inmates' property, including items that are not permitted in G Cell House. *Id.* at ¶4. Mr. Davis was not assigned to G Cell House as part of his duties in 2021, and his duties have never included an assignment to G Cell House. *Id.* at ¶ 7. He does not recall Mr. Phillips asking him to return his fan while he was placed in G Cell House in 2021, asking him to open the windows in G Cell House, or asking him to get assistance for his medical needs. *Id.* at ¶¶ 9-11.

**G. Procedural History**

Mr. Phillips brought this action in June 2021. *See* dkt. 1. After the complaint was screened, Mr. Phillips has proceeded on an Eighth Amendment claim of excessive heat against Warden Reagal, Captain Boldman, Lt. Pfleeger, and Officer Davis. *See* dkt. 8. Defendants have moved for summary judgment, dkt. 40, and Mr. Phillips has filed a cross motion for summary judgment, dkt. 60.

**III. Discussion**

The defendants argue that Mr. Phillips' claims for injunctive relief are moot because he is no longer in G Cell House and his personal fans have been returned to him. Dkt. 41 at 7. They argue that his claims for damages fail because (1) Mr. Phillips was not exposed to an objectively serious risk of harm; (2) the defendants were not deliberately indifferent to any risk of harm to Mr. Phillips; and (3) the

defendants were not personally involved in a constitutional deprivation. *Id.* at 10-11.

### A. Injunctive relief

Mr. Phillips is proceeding on a claim for injunctive relief against Warden Reagle in his official capacity. *See* dkt. 8 at 3 (screening order). Warden Reagle argues that Mr. Phillips' claim for injunctive relief is moot because he is not currently in G Cell House and is now in a general population unit. Dkt. 41 at 7; dkt. 42-1 at 14 (Mr. Phillips testified at his June 7, 2022, deposition that he had been in a general population unit for the last six months).

A prisoner's transfer to a different area of the same prison where the prisoner is no longer subjected to the alleged constitutional deprivation may render a claim for injunctive relief moot. *Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (noting that a prisoner only has standing to request prospective injunctive relief when he faces a "real and immediate threat of future injury as opposed to an injury that is merely conjectural or hypothetical") (internal quotations omitted). Mr. Phillips is not currently confined to G Cell House, where the alleged constitutional deprivation occurred, and there is no evidence that he is at imminent risk of returning to G Cell House. The Seventh Circuit previously held that an inmate's release from disciplinary segregation, where he was subjected to an unconstitutional black box restraint policy, rendered his claim for injunctive relief moot, even though it was possible that he could be returned to disciplinary segregation in the future. *See Knox v. McGinnis*, 998 F.2d 1405, 1413 (7th Cir. 1993) ("Presumably, Knox would be returned to segregation only

if he were to violate a prison rule, such as the one prohibiting the possession of dangerous contraband. Although that may be a very real possibility given that contraband was found in Knox's cell twice in four years, we must assume that Knox will abide by prison rules and thereby avoid a return to segregation status").

The Seventh Circuit's decision in *Knox* is analogous to Mr. Phillips' circumstances in this case. Despite Mr. Phillips' disciplinary history, s*ee* dkt. 42-1 at 59 ("I've been placed in disciplinary segregation so many times that I can't remember."), the Court "must assume" that he will abide by prison rules and avoid a return to G Cell House, *Knox*, 998 F.2d at 1413. Because Mr. Phillips does not face a "real and immediate" constitutional deprivation, his claim for injunctive relief is moot, and the Court **GRANTS** Warden Reagle's motion for summary judgment as to this claim.

### B. Damages

Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994). Conditions of confinement count as cruel and unusual punishment in violation of the Eighth Amendment only when they deny a prisoner "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Subjecting a prisoner to extreme temperatures may violate the Eighth Amendment. *See Dixon v. Godinez*, 114 F.3d 640, 643-44 (7th Cir. 1994) (extreme cold).

To prevail on an Eighth Amendment conditions of confinement claim, the plaintiff must show that (1) he was subjected to an objectively serious condition that posed a substantial risk of serious harm; and (2) that the defendant was deliberately indifferent to the risk of harm, which is to say, that "the official knows of and disregards an excessive risk to inmate health or safety." *Haywood v. Hathaway*, 842 F.3d 1026, 1030-31 (7th Cir. 2016).

### 1. Objectively serious condition

Prisons must provide inmates with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Seventh Circuit has "interpreted this general statement as a requirement that prisons provide inmates with 'reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities.'" *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (*quoting Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016)).

Published Seventh Circuit cases on extreme temperatures in prisons mostly involve allegations of extreme cold. *E.g.*, *Haywood*, 842 F.3d 1026; *Gillis v. Litscher*, 468 F.3d 488 (7th Cir. 2006); *Dixon*, 114 F.3d 640; *Del Raine v. Williford*, 32 F.3d 1024 (7th Cir. 1994) (collecting cases). Comparatively few published Seventh Circuit cases involve extreme heat in prison. *But see Scarver v. Litscher*, 434 F.3d 972 (7th Cir. 2006) (summary judgment for defendants affirmed based on a lack of evidence on the subjective element of a prisoner's Eighth Amendment claim without an express holding as to whether the heat the prisoner endured in supermax segregation was objectively serious).

The Court will analyze the objective element of Mr. Phillips' claims using the same analysis the Seventh Circuit applies for prisoner claims involving extreme cold, as the Seventh Circuit has done in in unpublished cases and as other circuits have done. *E.g.*, *Green v. Walker*, 398 F. App'x 166, 169 (7th Cir. 2010) (citing *Dixon*, 114 F.3d at 645); *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) ("the Eighth Amendment is concerned with both the 'severity' and the 'duration' of the prisoner's exposure to inadequate cooling and ventilation") (quoting *Dixon*, 114 F.3d at 643).

In considering Eighth Amendment claims based on extreme temperatures, courts consider several factors, including the severity of the extreme temperature, its duration, whether the prisoner has alternative means to protect himself from extreme temperatures, the adequacy of such alternatives, and whether the prisoner must endure other uncomfortable conditions as well as the temperature. *Dixon*, 114 F.3d at 644.

Applying the standard set forth in *Dixon*, the Court finds that the evidence taken in the light most favorable to Mr. Phillips supports a reasonable conclusion that the extreme heat in G Cell House during Summer 2021 was an objectively serious condition.

Mr. Phillips testified that the severity of the heat was unbearable. Dkt. 42-1 at 46. It is undisputed that he collapsed on two separate occasions from the heat, and the medical staff had to use ice packs to reduce his body temperature. *Id.* at 32-34. Even after these infirmary visits, he continued to experience dizziness, blurred vision, and insomnia. Dkt. 60-1 at 4. Although extreme

12

temperatures need not imminently threaten a prisoner's health to violate the Eighth Amendment, *see Dixon*, 114 F.3d at 644, in this case the heat Mr. Phillips endured caused two medical emergencies.

The duration of the extreme heat—Summer 2021, including the two days during the same week in June when Mr. Phillips collapsed—also supports Mr. Phillips' Eighth Amendment claim. *Compare Haywood*, 842 F.3d at 1030 (subjecting a prisoner to freezing temperatures for four days was an objectively serious condition).

Mr. Phillips was provided with alternatives to stay cool—the blower system and ice—but he testified that these alternatives were not effective, and his trips to the infirmary support this assertion. According to Mr. Phillips, prison officials refused to open the windows of G Cell House, and the blower system actually made the heat worse. *See* dkt. 42-1 at 31; dkt. 64 at ¶ 25. Although Mr. Phillips did not comment specifically about the scoops of ice, that limited and temporary measure is not enough, standing alone, to show that the heat was not objectively serious. *See Dixon*, 114 F.3d at 644 ("We are dubious of defendants' insistence that a single blanket is sufficient to combat such cold for weeks on end."); *Haywood*, 842 F.3d at 1030 ("Haywood maintains that the guards refused to repair the window or provide adequate clothing and blankets. Instead, he asserts, the guards made conditions worse by turning on the ventilation system (which he calls 'blowers'). Wind aggravates the effect of cold by increasing the speed at which heat is removed from exposed skin."). *See also Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017); *Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015).

Finally, Mr. Phillips was subjected to other uncomfortable conditions of confinement that may have exacerbated the effect of the heat. He was in a disciplinary segregation unit and was confined to a cell for twenty-three hours a day. Dkt. 42-1 at 57. The confined space subjected him to foul odors, as he was constantly sweating and had limited access to showers. *Id.* at 48-49. He was also prescribed antipsychotic medications that made him lethargic. *Id.* at 8. While none of these conditions alone would violate the Eighth Amendment, a jury could reasonably conclude that collectively they made the heat in G Cell House more difficult to endure. Previous Seventh Circuit cases involving extreme temperatures also involved prisoners held in segregation or "supermax" units. *E.g. Haywood*, 842 F.3d 1026; *Gillis v. Litscher*, 468 F.3d 488; *Dixon*, 114 F.3d 640.

The Court therefore considers whether the defendants were deliberately indifferent to this objectively serious condition.

### 2. Subjective deliberate indifference

#### i. Warden Reagle

Warden Reagle was the most senior supervisory official at Pendleton Correctional Facility during the time relevant to this lawsuit.

Whether supervisory personnel are sufficiently involved in an alleged constitutional violation such that they may be liable for damages often depends on that person's knowledge of, and responsibilities regarding, the alleged harm. Although the inquiry is case-specific, two scenarios are illustrative. First, the supervisor could be actually engaged with the underlying issue. *E.g., Haywood,*

842 F.3d at 1032-33 (holding that the Warden could be held personally responsible for the harm caused by cold prison conditions because the evidence showed he "had actual knowledge of the unusually harsh weather conditions, that he had been apprised of the specific problem with the physical condition of [the plaintiff's] cell (i.e., the windows would not shut), and that, during the time period of [the plaintiff's] complaint, the warden toured the segregation unit himself"). Or second, the underlying issue could be the direct responsibility of the supervisor in question, rather than one of his or her subordinates. *Id.*; *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (Warden was liable in conditions of confinement claim because he "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed").

Here, Mr. Phillips has not designated evidence that Warden Reagle knew about the extreme heat in G Cell House, that some or all the windows in G Cell House were inoperable, or the inadequacy of the blower system and other interventions. For example, the record does not include any grievances from Mr. Phillips or other prisoners that were reviewed by Warden Reagle, nor does it include correspondence between Warden Reagle and other Pendleton officials about the conditions of G Cell House. Mr. Phillips was required to designate evidence to support his claim against Warden Reagle, *see* Fed. R. Civ. P. 56(c)(1), but has not done so. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) ("Summary judgment is the moment in a lawsuit when a

party must show what evidence it has that would convince a trier of fact to accept its version of events.") (cleaned up)).

While Warden Reagle was responsible for the policy that led to the confiscation of personal fans from Mr. Phillips and other inmates in G Cell House, the evidence shows that he had a legitimate reason for prohibiting these fans: ensuring the safety and security of the facility. Personal fans may be used by inmates as weapons, and many inmates, including Mr. Phillips, were placed in G Cell House because they violated prison rules by possessing a weapon. Dkt. 42-1 at 16; dkt. 42-2 at ¶¶ 5, 7. Mr. Phillips argues that Warden Reagle is using safety and security as a pretext to take further punitive action against prisoners in disciplinary segregation, and that if he was actually concerned with safety and security, he would ban personal fans from the entire facility. Dkt. 64 at ¶¶ 6-8. But it was not unreasonable for the Warden to implement a policy prohibiting inmates in disciplinary segregation from possessing items that could be turned into weapons, even while allowing such items in general population.

*Scarver v. Litscher* is instructive. There, the Seventh Circuit affirmed summary judgment for the defense in a case involving extreme heat in a supermax facility, the court explained, "Prison authorities must be given considerable latitude in the design of measures for controlling [violent prisoners suffering from mental illness] beyond what is necessary for security. It is a difficult balance." 434 F.3d at 976-77 (citing *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985) ("The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about

16

the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state how to run its prison system.") (cleaned up)); *see also Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.") (cleaned up).

Applying *Scarver* here, the Court must defer to the judgment of Pendleton officials that inmates in disciplinary segregation should be prohibited from possessing personal fans in their cells based on concerns that personal fans may be used by inmates as weapons. Mr. Phillips has designated no evidence that Warden Reagle knew that confiscating personal fans from inmates in G Cell House, or failing to take other actions to address rising temperatures during the summer months, would subject them to objectively serious temperatures. A reasonable jury could not conclude from the designated evidence that Warden Reagle knew of and deliberately disregarded a risk to Mr. Phillips' health or safety and his motion for summary judgment is **GRANTED**.

### ii.   Officer Davis

Officer Davis was the Property Room Supervisor at Pendleton. Dkt. 42-3 at ¶ 3. His only involvement in this case was confiscating Mr. Phillips' personal fans in March 2021 in accordance with the policy instituted by Warden Reagle. Dkt. 42-1 at 21, 27. There is no evidence that the temperature in G Cell House was unbearably hot in March 2021, that Officer Davis was aware of the extreme

heat in Mr. Phillips' cell in Summer 2021, or that Officer Davis was aware Mr. Phillips had collapsed from overheating. Nor is there evidence that Officer Davis had the authority to open or repair the windows in G Cell House. Without that knowledge or authority, Officer Davis could not have been deliberately indifferent to the extreme heat. Officer Davis' motion for summary judgment is **GRANTED**.

### iii.    Captain Boldman and Lieutenant Pfleeger

Correctional Captain Boldman and Correctional Lieutenant Pfleeger were supervisory officials assigned to G Cell House. Dkt. 41 at 3. The evidence taken in the light most favorable to Mr. Phillips permits a reasonable conclusion that they were aware of the extreme heat in G Cell House and that the heat was more severe on the top range where Mr. Phillips' cell was located. Dkt. 42-1 at 27 (Mr. Phillips testifying that Captain Boldman and Lt. Pfleeger were physically present on the range). The issue is whether their actions or inactions amounted to deliberate indifference.

"Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (citing *Farmer*, 511 U.S. at 844; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002); and *Sinn v. Lemmon,* 911 F.3d 412, 423–24 (7th Cir. 2018) (holding that no reasonable juror could infer deliberate indifference where prison officials took sensible steps to address unsafe prison conditions)). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a

constitutional violation." *Peate*, 294 F.3d at 882. But prison officials who know about a condition which poses an excessive risk of harm to inmates, such as bitterly cold cells, may be liable under the Eighth Amendment for disregarding that condition." *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997).

Here, Mr. Phillips asked Captain Boldman and Lieutenant Pfleeger numerous times to open the windows in front of his cell, but they refused to do so. Dkt. 42-1 at 30-31. Mr. Phillips overheated, passed out, and was discovered on the floor and diagnosed with heat stroke. *Id.* at 32-33. Even after suffering heat stroke—thus demonstrating that he was personally susceptible to heat-related illness—he continued to be housed for 23 hours a day on the top range where the heat was excessive. Dkt. 60 at p. 1. Mr. Phillips testified that he could feel a big temperature difference between the top range where he was housed and the lower levels because the heat rises. Dkt. 42-1 at 49-50. Days later he again required medical treatment for heat stroke.

Defendants argue in reply that the heat was addressed by a "blower" ventilation system that circulates air, nine mounted wall fans on each cell block, and regular temperature checks with hand-held thermostats. Dkt. 71 at 8 and 13. They also note that when the temperature exceeds eighty-five degrees Fahrenheit each inmate is provided an extra scoop of ice during the day. Dkts. 42-2 and 42-4 at ¶¶ 9-11, 13. But, a reasonable jury could conclude that these remedial measures were inadequate, consistent with Mr. Phillips' testimony, and that additional reasonable measures could and should have been taken to reduce the risk Mr. Phillips faced due to exposure to extreme heat on the top

range of G Cell House where he was confined for 23 hours a day and thus unable to find respite. For example, in *Rogers v. Scott*, the court concluded that officials were not deliberately indifferent to extreme heat in a civil commitment facility because they "kept the ventilation system running, placed industrial-sized fans in the dayroom, and began leaving the outside door open at night to let cooler air into the unit. The defendants provided ice and residents had access to water at all times. During the day, residents could leave their rooms, use the showers, go outside, and utilize the air-conditioned gym on a rotating basis." 695 F. App'x 155, 160 (7th Cir. 2017). Compared to those measures, a reasonable jury could find that Captain Boldman and Lt. Pfleeger knew that the extreme heat presented substantial risk to Mr. Phillips and that more needed to be done to mitigate that risk.

"Because requests for relief which have fallen on deaf ears may evidence deliberate indifference, prison officials who know about a condition which poses an excessive risk of harm to inmates, such as bitterly cold cells, may be liable under the Eighth Amendment for disregarding that condition." *Dixon*, 114 F.3d at 645. Whether Captain Boldman and Lieutenant Pfleeger were deliberately indifferent to Mr. Phillips's exposure to extreme heat is a material fact in dispute. *Id.* (reversing and remanding summary judgment for defendants finding sufficient evidence of deliberate indifference where defendants knew of and deliberately ignored the cold).

Accordingly, Captain Boldman's and Lieutenant Pfleeger's motion for summary judgment is **DENIED**.

20

## IV. Conclusion

The defendants' motion for summary judgment, dkt. [40], is **GRANTED** in favor of Warden Reagle and Officer Davis and **DENIED** as to Captain Boldman and Lieutenant Pfleeger. Mr. Phillips' motion for summary judgment, dkt. [60], is **DENIED**. The defendant's motion to strike Mr. Phillips' belated declaration in support of his motion for summary judgment, dkt. [77], is **DENIED as moot**, because the declaration does not affect the outcome of this Order.

Mr. Phillips' motions requesting a transcript of a telephonic status conference on September 23, 2022, which he seeks to use as evidence in an unrelated lawsuit, dkts. [83] and [84], are **DENIED**. His motion for summary judgment ruling is **GRANTED** because this order has issued.  Dkt. [86].

Mr. Phillips' motion to Appoint Counsel, dkt [26], has been reconsidered and the Court will attempt to recruit counsel to assist him with settlement and trial, if necessary.

**SO ORDERED**.

Date: 8/31/2023

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JAMES E. PHILLIPS
106333
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel

21